and Powers. Thanks. Counsel, I forgot to mention something. Sometimes in a two-defendant case, we start asking a lot of questions of the law enforcement. The lawyer for the first defendant and the lawyer for the second defendant never gets to argue. If you would like us to divide up the time, I'll just tell the clerk however many minutes you want. Your Honor, Dennis Reardon appearing, and I will actually make the argument on behalf of both defendants, Your Honor. I would ask the Court that if during rebuttal there is some occasion for Mr. Pavone to address a matter of particular concern to him, that he be allowed to do so. But it is my intention. Let's work it out so he's not jumping up in the middle of your argument in chief. It will distract him. No, just as you say, we'll be fine. Yes. Yes, Your Honor. And what I'm about to do is hand to the clerk and to closing counsel a response to the 28J letter that the government filed in this matter in, I believe, a week or two ago. And I will address that in my remarks. As the Court is aware, or let me be clear, I'm going to divide the principal argument between what I regard as the two main issues in the case, which is Defendant Power's right to counsel claim and then Defendant Garcia's Castigar claim. And in that regard, Your Honor, beginning with the Powers issue, Powers suffered two related but analytically distinct deprivations of his right to counsel. The first occurred when he was excluded from a hearing on whether his counsel of choice would be disqualified. And the second, of course, occurred when we contend occurred when the Court decided, in fact, to disqualify his counsel of choice. And beginning with the first issue, that is, the exclusion from the ex parte conference on whether the law firm of Michael Raines would be disqualified as Powers' counsel, the standard is clear, Kentucky v. Stintzer, if the presence of the defendant and his counsel could have contributed to the fairness of the proceeding, of the disqualification proceeding and the hearing that was held in Canberra, then the defendant and his counsel had a right to be there. This Court has held in Campbell v. Stewart, in the very context of a disqualification issue, a disqualification hearing, that it is reversible per se to exclude a defendant from such a hearing, again, if the case was at Campbell v. Stewart. I don't think the mandate is issued yet in Campbell. It's still subject to possible en banc review. I think that's correct, Your Honor. I checked this, and the Supreme Court has over and over again told us, quit calling things structural error. Almost everything is reviewable under the standard that requires prejudice. Well, it is an opinion that's been on the books for several years now. But let me accept the Court's point and say let's deal with it as is. Let's assume that you can't just hang your hat on Campbell and go home. Fair enough. The point here is the first question, did counsel – was there a right to counsel there? Did they have a right to be there? Let's put the question of prejudice aside for just a moment. Could they have contributed to this proceeding? There could be no serious argument. Let's say you're right on that. Right. What's the prejudice? Well, the prejudice is just this. If you look at the hearing, okay, the district court says, I've been told, and he literally states it as a matter of fact, he says, let me just say from what is clearly the fact the government is going to call seven of these witnesses in their case in chief and has indicated such, meaning that you will have to cross-examine on the defense side these witnesses, that seven, certainly raises in my mind a significant question of potential conflicts here. The government was never going to call those seven witnesses. And if defense counsel had been in that in-camera hearing, they would have contributed enormously to that. We know the statement is not true. Okay. How do they know who the government is going to call? Because what they could have. When I was in practice, often I didn't know for sure who I was going to call until I saw how things developed. That's right. But was the district court entitled to a statement-by-statement, witness-by-witness rebuttal, of the government's assertion that they were going to call these witnesses? The district court was. But it seems that the potential was there to call those witnesses. These are individuals that certainly had knowledge of what was at trial, correct? And how do we measure potential, Your Honor? We would measure it by. . . The government made statements like this. Officer DeVos has made an inconsistent statement about whether Powers initiated a fight. That is simply untrue. It was absolutely, flatly untrue. There was no such inconsistent statement. She said, I'll have to get it. What counsel could have done is said, Your Honor, that's simply not true. There's no inconsistent statement by DeVos. What counsel could have said is, Your Honor, we have the statements. Here they are. Well, but then you're telling the lawyers how they're going to have to try their case. And if any of these people could be called, which it certainly seems like there was a potential, then you're in the situation where the lawyer would have to be cross-examining people that he has confidential information about. And I think the district court made the comment, doesn't have to wait to see the train wreck. And the standard under Wheat gives pretty broad latitude to the court to prevent having a whole trial, and then when you're on rebuttal, you have the exact same situation, and then the defendant can raise IAC at the end of it. Well, let me get to that, Your Honor, because you're on the merits of the disqualification. But the question before me now is, they had a Federal Sixth Amendment constitutional right to be at the session. What difference did it make that they weren't excluded? The answer to that question is that the court had to make a reasoned judgment about whether there was a likelihood of conflict. And the only way he could do that was listening not only to the government's theory on whether there was a conflict, but listening to the defense theory on why there wasn't a conflict. And the reason there wasn't a conflict is that did the court have a right to know fully what these statements were? Did it have a right to assess whether any of these people were really likely to be government witnesses? Why did the government not call any of them except one? That one, Manzano, what the government said in chambers was, well, we will probably call him because we want to get him out there before the defense gets him out there. Well, fine. What the defense could have pointed out is, look, they're not saying he's going to say anything that really conflicts with his prior statements because he's not. You're asking rhetorical questions. Why would the government call them? Why wouldn't the government call them if it said it would call them these? But I'm thinking of them as real questions, and there are obvious likely answers just as these things go. You've got one law firm representing a whole bunch of pelican bay guards who are being investigated for possible crimes. Government counsel is probably optimistic that some of them are going to roll over on the others in order to get breaks and fearful that some of them are going to go south on it after initially indicating that they're going to roll over. These things happen all the time in multiple potential defending cases. Your Honor, I want to address those concerns as long as I'm sure I've satisfied the first question. You're asking me questions about whether the disqualification order was correct. The issue I'm addressing is there is a great deal of information that this district court judge was deprived of because defense counsel was not present at the in-camera session. That's the prejudice. Okay. Let me just give you a specific example. This district court judge did not know that the prosecutor's statement that DeVos had given an inconsistent statement from his grand jury testimony and, in fact, had once said that Powers started this fight was false. It was absolutely, utterly false. It had no basis of fact in it. And the only reason that the district court would have possibly believed that statement is it didn't get both sides of the story. That's the prejudice from having an in- I didn't understand it. What was the defense counsel likely to tell the judge? He was going to say, Judge, here are all the statements. He's never made an inconsistent statement. The government is flatly wrong. They are flatly wrong. The other thing they said is things like, well, we think some of these people, you know, will change or they've given inconsistent statements or they could be reached. The fact of the matter is defense counsel had all of the statements. But they still haven't. How do you know what they're going to do when they testify in court? Okay. Because anyone that's done trial work knows that, you know, I think we've all sat there and our jaws dropped when someone says something  I'm about to address that, Your Honor. But the question is, was it wrong to hold an in-camera hearing? It was. Did it make a difference? Did it deprive the court of relevant information? It absolutely did. So what I'm saying is on that basis alone you have reversible error. Now let me get to the question that you're all raising, which is let's just say that this record had been formed in a proper and constitutional fashion. Let's say the present record had been obtained without having an illegal unconstitutional ex parte conference. Then the question would be, is the judgment of the court right? And on this I stand, Your Honor. There is only the government has no right to, in the context of a conflict issue, accept any interest, express any interest except this. The court has to ensure that the defendant gets constitutionally adequate counsel. The government only has a subsidiary interest in not having the defendant get ineffective counsel and then come up here on appeal and complain about it, right? That's its interest. It doesn't have any right to get greater access to witnesses than it would if they were represented by one lawyer or another. So the issue is, by the time the court decided this, was there still a danger that the defendant would be burdened with a real conflict of interest by his lawyers and that, therefore, maybe the government would be cheated out of their conviction on an IAC or a conflict claim? There wasn't, for this reason. Every witness came in and said, I'm not being represented by Raines anymore, and I waive completely my attorney-client privilege. He can use anything he wants to cross-examine me. If that's the case, how could there possibly be a conflict on Raines' part? And consider this. They file these written waivers. Even if Raines is kicked out of the case, every one of those defendants can be cross-examined on their private conversations with Raines anyway because they waived the right to the attorney-client privilege, and they specifically said he can give powers all of our confidential statements. So the kicking Raines off the case did not protect any interest of the witnesses. What is the conflict? Well, under your theory, any time that these witnesses would waive, as they did here, that the court would never be able to exercise its discretion the other direction under Wheat. But why would it? Well, if Wheat's interest... What interest would it be protecting you on? No, but you're saying any time if the witnesses come in and waive, that's the end of the inquiry? And I don't think that's what Wheat says. Your Honor, I submit this. What Wheat says is that there's a presumption in favor of the right to counsel of choice, okay? You can't take that away. You have no discretion to take that away unless there's a real chance of a conflict. What is the only chance of a – there's two things that went on here. The government said two things. One, hey, maybe these people will be constrained in their cross-examination by the attorney-client privilege. That went out the window. That was done. That's done. The only other thing the government said is, you know, really sort of said is, well, we've kind of – you know, maybe there's no problem as far as power is right to counsel, but Wheat kind of like reins out of the case because maybe we'll have a better shot at these witnesses. That's not a valid interest. That's not a valid interest. You could have a lawyer and you could – the government could have witnesses and they say, God, I don't want to get cross-examined by that guy. He's terrific or he's mean or whatever. They can't disqualify a lawyer on that basis. The only basis to disqualify the lawyer is that he will deprive the defendant of the effective right of cross-examination because he's constrained by the attorney-client privilege. And he's not. He wasn't in this case. It was done. What is – what interest of the government remained in kicking this attorney off the case once it was clear that the attorney was free to cross-examine these former clients in any way he chose? I ask that question. Well, the fear of the court is that you don't take – that you don't know what a waiver encompasses until the whole trial is over. And so if somehow your waiver is inadequate, then later it can come back and you do have a conflict. Your Honor, look at the waivers. How could – that waiver is – that's like saying that when a client is voided by a judge and waives his right to trial, the trial might – the waiver might not be defective. The waivers taken in this case – the trial judge never said there's anything defective about these waivers. Once a client says, I waive the attorney-client privilege, that happens all the time. It's done. They've had it. Their privilege is gone. Given these waivers – This conflict is different, though. Waiving conflicts is different, though. But the only conflict – the only basis on which a conflict was asserted in this case, Your Honor, was the grounds that these attorneys might not give powers of fair shake because they'd be constrained by the attorney-client privilege with their former clients. Once that waiver is gone, what's the conflict? What conceivable – now, look at Wheat. In Wheat, the thing was that the potential witnesses were actually defendants. And they said, you know, you could have a situation where the deal doesn't go through and these defendants come back in the case. That was not present here. There was no suggestion that these witnesses might in any way play a role in the case other than witnesses. The question I ask the Court is once they waive their attorney-client privilege – and I ask for guidance on it – what conceivable basis was there for finding that Mr. Raines would be less aggressive in cross-examining them than anybody else, particularly since whoever replaced Mr. Raines was going to have the same access to the privilege information as Raines would? There's nothing on the other side of the – and Powers, of course, files a waiver saying, I accept Raines's representation. I would be laughed out of this Court if I came up here on this record. Let's say the Court had allowed Raines to represent Mr. Powers. And I came up here and said, given those waivers by the witnesses and the waivers by Powers that Raines had a conflict of interest and somehow I was deprived of my right to counsel, I would be laughed out of this Court. This Court would never hold that that was – that passed the straight-face test. If Powers makes a knowing waiver, all the witnesses make a knowing waiver. I submit to Your Honors what interest – I submit that at the end of the day, what this – the effect of it was simply to remove from the case the most experienced lawyer who represents correctional officers in the state and that there was no valid interest of the government and certainly no valid interest of Powers served by removing his counsel of choice. I thought you were the most experienced lawyer representing – This is my second case, Your Honor. I do want to go – I want to answer any question the Court has, but this is an important and extended argument and I do want to make what the critical point about the Garcia-Castigard claim is. And that's reflected in these exchange of letters, because the United States Supreme Court has, in my view, settled this matter and there is only one way to handle the And that's for this reason. The reason is that the government, when it responded to our Castigar claim – look at your brief, they did – their brief – they did not cite or discuss one Castigar case. What they attempted to do was say that compelling testimony, as was done on Garcia's part, compelling it under force of law, is no more serious a constitutional violation or issue than an unwarned Miranda statement, voluntary but unwarned. And, therefore, instead of following all of the Castigar law, which says they have to prove that they had an independent source for this October 2nd statement, they simply say the October 2nd statement was Mirandized. This is like a situation where you have to prove independent source. I think they just have to prove it's not the fruit of the earlier compelled interviews. If I've got the facts right, what happened was Garcia had previously given statements in his first two interviews not Mirandized. No, no. Compelled, Your Honor. Compelled. Compelled. Then – that's right. You're right. But then this third interview, Garcia asks for it. It's three days later and it's at a neutral place. Right. An interviewer that Garcia requested and he gets a Miranda warning. Right. So my thought is that under ELSTAD, this is just independent of – it's not fruits. It's the exercise of independent will by Garcia. Right. Because I remember the way the Supreme Court put it was people aren't like things. Finding one thing may be the fruit of finding another thing. Right. But people exercise independent will to decide what to do. Right. And that's why we win on Missouri v. Siebert, Your Honor, because the argument made in Missouri v. Siebert was un-Mirandized statements, then Miranda, then a subsequent statement, Oregon v. ELSTAD, no harm, no foul. Here's what the majority says. Now, the critical fact that you left out, Your Honor, is that at the first interview, they say you must testify. It's compelled. You'll be fired if you don't. And by the way, your testimony will be used against you to impeach you. Absolutely false. Absolutely untrue. Categorically wrong under United States Supreme Court principle. But what is Garcia told? You just gave a two-hour statement that we made you give, and if you're ever tried, it's coming in against you if you testify. Don't they give them more than one warning, though? I mean they – well, here's the key thing. They say that. Garcia calls them up and says, hey, I want to talk to you. I made some mistakes. I want to clear them up. Okay. It's very clear he's calling them to clear up problems in the compelled statement. They get there. They give them their Miranda warnings. But what don't they do? They do two things, and this settles it under Missouri v. Siebert. One, they don't say, oh, by the way, we were wrong. Everything you said two days ago, you're home free. Can't ever be used against you. Don't worry about it. If you're here because you're worried about what you said, go home. They don't say that. And the second thing they do is they say, now, let's sit down and let's go over line by line what you said in your compelled statement. And as Justice Souter says, upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing, once the police begin to lead him over the same ground. What is worse, telling a suspect that anything you say can and will be used against you without expressly accepting the statement just given previously could lead to an entirely reasonable inference that what he has just said will be used with subsequent silence being of no avail. So the Supreme Court has said if you lead somebody to believe, you can give them Miranda warnings, but unless you clear up the fact that what they've just said can never be used against them, you haven't cured the problem. What does Justice Kennedy say in the majority? From your perspective, it doesn't matter at all that Garcia contacted, that Garcia initiated the contact. Not when he was told that what he said could be used against you falsely, wrongly, unconstitutionally. Absolutely. And here's the beauty of it. We win under the dissent in Missouri v. Siebert because Justice O'Connor v. Scalia and the Chief Justice and Justice Thomas says, well, you know, we think your test here is we don't agree with it. We think that it really is Oregon v. Elstad. But what Justice O'Connor said is I've remanded back for a further decision. She said, but I note that unlike the officers in Elstad, Officer Hanrahan referred to Siebert's unworn statement during the second part of the interrogation when she made a statement at odds with her unworn confession. And she goes on to say that such a tactic bears on the volunturner's inquiry. So what she's saying is you don't get to say that this subsequent Mirandai statement is voluntary if what you're doing is taking an illegally obtained statement and leading the He says you need specific corrective measures. The only way that this statement becomes admissible under Missouri v. Siebert is if the officer says, you know what, Jose, we screwed up on Saturday or three days earlier. We told you that we could use that against you. And the wording is literally don't think for a minute that this won't be used against you to impeach. We screwed up. You're home free. You don't have to worry about it. And the only reason I want you to remain here is if you have decided, independent of that, to give a statement, and by the way, I'm not going to take you through your prior statement and make you respond to each thing that you said before. This case is, Your Honors, I submit to you that the exclusionary test for compelled statements is in fact more far-reaching than it is for Miranda statements. But under the present Miranda test, as of June 24th, there is no way that the government can get in the second statement because of the statement to Garcia, A, you've got to testify, it's compelled, and, boy, we're going to use it against you. Counsel, I just want to draw your attention to the clock. Right. I have a minute and 30 seconds, Your Honor, and I'll sit. No. No, you're a minute and 33 seconds over. Oh, over. I apologize, Your Honor. And I will perhaps ask the Court's indulgence for 30 seconds. This is a substantial case, and I know you've got co-counsel. Even though you've used all your time, we will have 60 seconds available for rebuttal. Thank you, Your Honor. May it please the Court, my name is Gregory Freel on behalf of the United States. I first want to address the Castigar issue and then turn to the disqualification issue. Can you clarify for me that where the errors were and is it the Lieberger admonition and when it finally got right and where that was relative to when Mr. Garcia again contacted, said that he wanted to clear some things up? That's right. There were no errors in the Lieberger warning. It was incomplete. What Captain Smith said at one point is anything, as you know in this interview, can be used for impeachment purposes. And when was that? Pardon me? When was that? What is that? When was that? Oh, I'm sorry. Excuse me. That's on September 29th toward the beginning of the interview before Agent Ortiz then says, quote, if you do answer, none of your statements nor any additional evidence which is gained by reason of such statements can be used against you in any criminal proceedings. Let me point out, though, with regard to the statement about impeachment, it was technically correct but incomplete in this sense. There is a specific provision of the California Code, California Government Code 3303F3, which pertains to the use of compelled statements by law enforcement officers for impeachment purposes in civil proceedings. Now, certainly this individual didn't make clear he was referring to civil proceedings rather than criminal. And this wasn't a civil proceeding, though, eventually. No, but there was some discussion of a possible administrative action against Mr. Garcia. Certainly there may have been some confusion, but my point is that when a few minutes later, when Mr. Ortiz then made the correct, clear and unequivocal statement that could not be used, it cured whatever confusion may have existed. But there's a very important point. That was on September 29th, then, too? That was on September 29th. It was a few minutes after Captain Smith made the comment about impeachment. Then Miranda warnings are administered, and Mr. Garcia says, is asked whether he's willing to talk under Miranda. He says no. Then Ortiz administers what are known as the Leibarger warnings and made the statement I just quoted to you immediately prior to the substantive portion of the interview, then started asking substantive questions. But another very important point, even if an incorrect, even if there had been a misapprehension by Mr. Garcia about the use. There had been a what? A misapprehension on his part about the use of the statements for impeachment purposes. He explained in several places during the October 2nd interview why he requested the interview by Agent Ortiz and what he wanted to say. And none of those explanations have any relationship to some fear that somewhere down the road he might be subject to damage in cross-examination. Specifically, he said, I want to come forward and expose wrongdoing. I want to come forward and tell you that there are what I consider dangerous conditions at the prison because there's a free flow of alcohol, low morale that might get an officer killed. But I didn't want to do it in front of Captain Smith and Lieutenant Rousopoulos on September 29th. Because Mr. Garcia is saying they were involved in some of the improper actions. So let's assume that Mr. Garcia had refused altogether to answer any question on September 29th. If we take at face value his explanation on October 2nd for why he asked Agent Ortiz for an opportunity for an interview, that would have, the October 2nd interview would have occurred anyway. Because his point is, I want to expose wrongdoing, tell you about these things, but I don't want to do it in front of Captain Smith and Lieutenant Rousopoulos. So I submit, even though we do not have to show the absence of a but-for connection, even if that were the standard, I submit the evidence in the record based on what Mr. Garcia explained as his reasons would meet that but-for test. And I want to make very clear, especially in response to the Supplemental Authority Letter, the government is not taking the position that the standard here is identical to voluntary but unmerandized, a second statement following an initial voluntary but unmerandized statement. We made clear that in this Court's decision in Orso and the Supreme Court's decision in Elstead, they prescribed two different standards, one for voluntary yet unmerandized, followed by a second one, and one for a compelled statement followed by a second statement. We acknowledge we must meet that second test, which is more stringent, but the Supreme Court said that certain factors which we have here, such as intervening circumstances, passage of time, different location, and so forth, and consideration of any possible misconduct by the initial questioning officer, those factors in combination can show that the linkage between the two is sufficiently attenuated so that it is considered for legal purposes under the Fifth Amendment as being independent, and that's what we have here. And the fact that Mr. Garcia aggressively sought out the October 2 interview is highly important, and it's one of the reasons, along with the passage of time, why this case is very different from Missouri v. Siebert, where the Supreme Court essentially said, for all intents and purposes, that was a single interrogation. They intentionally decided to withhold Miranda warnings, get her to confess, took a 20-minute break, came back to her in the same location, they initiated the contact, gave Miranda, and then started questioning, and the basic point, well, there were two concerns, one that the police were basically trying to make an end-run about Miranda, but secondly, that the Miranda warning in that context was ineffective. Here we have a three-day gap. It was in a different location. It was Mr. Garcia initiating the contact and demanding to speak only with Agent Ortiz, essentially indicating that he felt comfortable with Agent Ortiz, because he expressly declined the offer that Agent Ortiz had made to have two union representatives attend the October 2 interview. And he said, I don't want the union here, I want to speak to you, indicating that there was no kind of compulsion that carried over. And so that's an independent statement. But the district, and we argued below, and it's our position here, that in light of that intervening act of free will, the entire October 2 statement could have been admitted. But the district court took a narrower approach that we believe is more protective than certainly Kastigar requires no more, which is the court went line by line through that interview and required us to show that Agent Ortiz had an independent source for each question he asked for which the response would, we were trying to get it admitted at the federal trial. First of all, I want to make very clear, there was no misrepresentation by the prosecutor in that case with regard to the question of Greg DeVos. The statements by Mr. DeVos, at one point he initially said, inmate black took a swing at agent, at Officer Powers, Sergeant Powers. Then later on he said, well, Sergeant Powers went to try to remove the inmate's clothing and he threw his hands up. And in the grand jury, Mr. DeVos was asked, well, did you see the inmate strike Sergeant Powers? And he said, no. Did you see him throw, the inmate throw any blows at Sergeant Powers? He said, no, I didn't see him throw any blows at anyone. There was some inconsistency. So I want to clarify that point. But what I'm getting at is the issue of whether the defendant was deprived of the lawyer of his choice. The substance rather than the due process? Well, I think the situation with Joseph Manzano, who actually was one of the seven witnesses that we were concerned with, and who actually did testify at trial and testified favorably to the government and was cross-examined by Powers' attorneys, illustrate very clearly the conflict that existed. We, the prosecutor here, accurately predicted that he would testify. At the time, Mr. Manzano was saying, I recall Officer Jones coming to the control booth and talking with Officer Schembri, which said, Mr. Manzano said in the grand jury, but I didn't hear anything about what was said. And the prosecutor said, well, at the very least, it helps us to have him confirm that there was that conversation between Jones and Schembri. But we think he's not telling the truth when he said he didn't hear anything. Because why would someone remember something that a conversation occurred so many years before if they didn't remember something about the substance? Then when it gets to, by the time of trial, Mr. Manzano, in fact, did say he remembered something. He didn't remember the specifics, but he remembered it had to do with rumors that an inmate was going to be attacked on the yard, which is different from what he had said all along. And what played out is exactly what the prosecutor said. I should also point out ñ Well, what about the waivers? Mr. Reardon said, well, you know, they had adequate waivers. And, you know, I mean, clearly he's correct on the point that removing counsel because they're really good or allowing the prosecutor to somehow have a hand in orchestrating that would be an inappropriate, you know, use of wheat. And so why isn't that happening here? Because they did waive. They did waive. And the district judge was concerned, based on who these potential witnesses were, that so far in advance of trial, they couldn't make an intelligent decision about what would play out. And I think the situation with Joseph Manzano illustrates the point. He submitted a declaration saying, I don't have any information that I think would be helpful at all to the government, and I have no information that I think would be adverse to Mr. Powers. In fact, at trial, he ñ Mr. Manzano testified and did provide information that was helpful to the government. And it was adverse. And it was adverse to Mr. Powers ñ yes, Mr. Powers in this regard. The primary witness linking Powers to the attack on Chester was testimony by Officer Shembree, who testified about this on behalf of Mr. Powers and said, this inmate is going to be stabbed, turn your head. The defense went after Shembree, vigorously cross-examined and tried to suggest that he either was making it up or that it ñ since it happened ten years before, he really didn't correctly understand it. It was important to bolster his testimony by putting then Manzano on the stand, who confirmed, A, the conversation took place, and, B, it had something to do with an inmate being stabbed on the yard. And there's one representation in the reply brief that I must respond to on this point, and that is an assertion that somehow Manzano's testimony was completely superfluous because Bill Jones ñ Officer Jones testified at trial that he did have the conversation. First of all, that was a defense witness who testified about three weeks later, so we couldn't be sure what he was going to say. But secondly, Officer Jones was asked, do you remember having ñ coming to the control room, did you remember having the conversation at the end of the day? And he said, no, I don't remember. He said, well, I don't remember. I'm not going to remember. I don't know if it's been three weeks or ten weeks or twenty-two, and he says that he doesn't. So it's important ñ Manzano's testimony is at least important to confirm the conversation ñ excuse me ñ occurred and that ñ the general topic of that conversation. But Manzano's testimony illustrates, based on the valid concern, that since they may not have the full picture about how this case is going to develop, they may decide to withdraw their waiver. And I know of nothing that would prevent them, if it became clear that things weren't playing out as they expected, to withdraw the waiver at that point. And the court and the prosecution was concerned about, we get six months down the road, trial starts, and the whole thing blows up, and there has to be a mistrial. Another point with regard to who these witnesses were, a number of them were alleged to not only be eyewitnesses, they were alleged to have been involved in the incident ñ again, in the attack on inmate Michael Black, which was a key incident in this case. And the allegations there were two of these officers, Payne and Tuttle, stopped and harassed inmate Black, took him to the gym, where Powers and DeVos were, and that Powers and some of the other officers beat Michael Black up. So clearly, there was a potential that some of these other individuals would not only be witnesses, but that they had some substantive involvement here. And one concern is, if things don't develop, as defense counsel says, in this case, that the defense counsel imagine, and strategy A doesn't work, and they might say, well, let's try strategy B, which is to sort of suggest, try to shift the blame to some of these other individuals who were involved in the incident, there would be some inhibition in doing that, because those are their former clients. And I should point out that Mr. Payne, even though he was not called, we tried to call him. He was subpoenaed to testify about the Black incident. In April of that year, he was subpoenaed to testify about the Black incident. In April 2002, and he invoked his Fifth Amendment privilege, so we, even at that late date during trial, we were trying to call him to testify about this incident. Finally, on this point, obviously it didn't, the situation didn't develop exactly as the prosecution predicted. But the disqualification motion occurred two years before trial. Nothing works as everyone hopes it will that far in advance. And, in fact, the defense counsel, in opposing the disqualification motion, said, Your Honor, we think it's almost certain that we're going to call all seven. So both sides were saying these are key people. We think we're going to call all seven. The other side is going to call all seven. It didn't work out that way. They called two. We called one and tried to call another who invoked the Fifth Amendment privilege. Unless the Court has further questions on that or the defense counsel has further questions on that, we're not going to call all seven. Thank you, Your Honor. Two key points. On the counsel question, the issue of whether a prospective witness was going to be favorable or unfavorable to the defense only had any grip if there was no waiver. So let's say I have a witness who's going to be completely supportive. There's no conflict of interest. But if you had a witness who was going to say something unsupportive of your client, then you'd have to aggressively cross-examine. And if you had your hands tied, then there could be a potential conflict. Manzano says, before the judge rules on disqualification, Manzano has filed a sworn waiver saying that if I am called as a witness and testify inconsistent with information I provided to the firm, they can cross-examine me concerning that firm. I waive my attorney privilege. I understand I'd be an adverse witness. The firm would have to impeach or discredit me to represent Mike Power's interests. The question is, what good, what conceivable, valid interest of Mike Power's, because that's the only thing that matters, could be served by kicking his counsel of choice off when, given that waiver, his counsel is, if anything, better equipped to aggressively cross-examine Mr. Manzano than any other lawyer would be? How does kicking Raines off and replacing him with somebody else, you can't possibly say that Mr. Ordos, as fond of the lawyer as he is, had any greater ability to cross-examine Manzano than Raines would have had. And the government doesn't get to kick people off for any reason in the conflict context other than that they fear, or they can make a credible claim, that that lawyer can't adequately represent his client. And Raines, with this waiver, absolutely could. And I submit to the fact that Mr. Ordos is a lawyer, and I submit to the Court that there is no case, no case yet that says that you can disqualify a lawyer when that lawyer has the full right to cross-examine a witness, adverse or not, who is a former client because the privilege has been absolutely waived. And I submit this. The government just said that you can pull a waiver of the attorney-client privilege. I ask for support for that. You waive the attorney-client privilege. You don't go back and the information is disclosed. Sorry, there is no law that says you can pull the waiver. Once Manzano filed that, Raines' hands were completely untied. On the Kastigar point, just one point. Could he be a witness, though? Let's just say that he's cross-examining that particular witness about statements that were made pursuant to their attorney-client privilege, and he's the only person that's a witness. What about that? Well, that's a very good question for this reason, Your Honor. That has nothing to do with the attorney-client privilege. That's an issue that comes up if a lawyer is ever dumb enough to interview a witness who could testify without a other party there. But let's be clear. The government never, never made that contention. And they never had — had they made the contention, this is the problem with ex parte proceedings, the response to it well could have been, this is a complete phantom because I'm never going to testify in this context. There's always somebody else who's available to testify to it, and it gets — so that would be advancing an argument that they — that the Court never relied on to justify the disqualification. But I recommend, you know, this is controlled by Missouri v. Siebert, because if you look at our brief at the bottom of page 41, here's what happens on the 29th. They tell Garcia, the lead investigator in this case is the DA. Then they say, nothing will be used against you in a court of law. And then a lawyer, an investigator says, anything that Jose may say today cannot be used by the district attorney in any criminal charges, which is not to say that we're not going to share it with the district attorney's office, which is absolutely impermissible under — under Castigar. Having said that, they then say, it can't be used as direct evidence. It can be used for impeachment purposes in court. We're not going to tell you that anything being said is not going to be used against Mr. Garcia. Obviously, it's in the criminal context. They just told him that everything's going to the DA's office. So the issue is, if they've told him this could be used against him, what Justice Kennedy says and Justice Souter says it is, well, in that situation, to get a subsequent statement in, you need curative measures. Curative measures. Justice Kennedy says, an additional warning that explains the likely inadmissibility of the pre-warning custodial statement may be sufficient. Justice Souter emphasized there was no curative measure. And in this situation, they're talking about where nobody explicitly says they can use the prior statement. They're just saying, unless — you still have to clear it up, even if you didn't explicitly give that impression. They told Garcia they could use this statement against him. And then, of course, he comes to them and wants to clear it up. Absent a statement that says, Jose, you don't have to be here. Everything you said is gone. It can never be used in a criminal proceeding. The second statement can't be voluntary particularly. And again, Justice O'Connor emphasized — Thank you, counsel. Okay. Once you said again, I figured I heard it. Fair enough. Thank you, Your Honor. United States v. Garcia and Powers is submitted. And we are returned until 9 a.m. tomorrow. Thank you. Thank you.
judges: Oakes , Kleinfeld, Callahan